Good morning, Your Honors. Good morning. My name is James Todd Bennett. I'm the attorney for Petitioner James Christian Werthmann. Would you pull the microphone just a little closer? It's hard to hear in this courtroom. Thank you. Is that better? That's perfect. It is. Okay. I'd like to reserve at least four minutes for rebuttal. And the first issue we have is the jurisdictional basis for this petition. As the Court's aware, this was a transfer case, originally filed in 2003 as a habeas corpus petition, and thereafter was transferred to this Court under the Real ID Act after it became law. And as the Court is aware, the time limits under 1252b1 do not affect the jurisdiction under these circumstances, so it has to be treated as a timely petition under those circumstances. Now, the first issue, then, is whether or not we have a — what we might call a gross miscarriage of justice. That has been raised as a standard. The only case by opposing counsel, the only case of the various cases cited by the — by on point would be Martinez-Marino, which basically holds that there is no gross miscarriage of justice when the petition, underlying petition, was simply challenging procedural issues as to a reinstated order. What's different in this case is that Mr. Werthmann has fundamental due process issues arising as a result of that very same — of the order in this case. He's removed without notice because of the failure to serve the notice of the decision of the Board of Immigration Appeals after it was recertified and was removed out of the Eloy Detention Center within the regulatory time permitted for expulsion, but without notice to counsel or to Mr. Werthmann. Now, the second issue raised — so it's a fundamental due process issue. In other words, you have a right to notice and opportunity to be heard. Mr. Werthmann's looking at the possibility of filing a petition for review, although that wasn't discussed. Nobody even knew there was an order at that point. But that is what he was essentially stripped of. Now, in addition to the notice and opportunity to be heard under the — preserved under the regulations and under the due process clause of the Fifth Amendment, we also have a second issue as to the certification procedures in this case. And in that case, under the regulations as they existed at that time, required that the judge on a remand — excuse me, on a second decision, which was the case in this case, after the BIA sent the case back to him, after the certification, he would have to issue notice of the certification and what the procedures were at that point. Now, a third issue comes up in this case — But let me just ask — make sure I understand the notice issue. When I.J. issued the oral decision, Mr. Werthmann and the attorney were present, correct? That is correct for both the 2000 order and the 2002 order. Okay. And are you saying that they were — and at that point, notice was given of certification as well? Oral. At the second hearing, after the remand from the Board of Immigration Appeals, oral indication in the order of the BIA and by the immigration judge, oral notice was given. But when he decides to recertify it back up, under the regulation as it existed at that point, required that he simply — he provide the parties with notice as well, that he's certifying this back to the board. And no notice was sent out, or no notice was received? None that I received. Now, there was — I believe in the government's brief, basic — respondent's brief — I'm assuming that because the oral statements in court were enough to put us on notice. That's a mandatory requirement under the regulation. And if he doesn't provide us with a written notice, then it's an invalid under the — an invalid issuance of the certification. But you're not claiming lack of knowledge? You're just claiming lack of receipt of the formal notification? Correct. That's why — So the order of the immigration judge at AR-4 is not sufficient, in your view, then? Yes. I — if he's going to certify it, he needs to give us notice, he needs to provide that written notice. So why is — if you have actual notice, but there's a — as you contend, I'll take that as a given, there's no receipt of the formal notification, why is that a gross miscarriage of justice? That, in and of itself, I would tend to agree with the Court. That would not — if that were the only issue in front of this Court, then that failure, in and of itself, may not be a gross miscarriage of justice. So what else do you have that's a gross miscarriage of justice? The failure to give him notice of the final decision of the Board of Immigration Appeals. And on that one, your contention is not that — is that they didn't send it out or that you didn't receive it? We did not receive it. We received no notification whatsoever. Mr. Werthmann wasn't served with it until the expulsion — in fact, I did not — counsel did not even know of the order until after the expulsion had taken place, when an attempt was made to set up an interview with Mr. Werthmann for post-decisional review. This all seems procedural. If I'm — what bothers me about this case is the substance of it. I mean, Mr. Kafka could hardly write a better story than what we have here, in terms of what's happened to him, the deadlines. The statute changed in such a way that, had this taken place even a few months later, the filing date would have meant that he would have been young enough to have the earlier treatment as a younger person and so on. Do we get to consider those things as part of this gross injustice? Well, gross injustice, in addition to that, would be — include, in my estimation, that the failure to adjudicate this visa petition at all plays into — comes into play. And that visa petition was filed in 1997, sat, gathered dust. His adoptive sister was adjudicated and received her green card — lawful permanent resident status, rather — whereas Mr. Werthmann was left sitting there with no adjudication. Well, it's possible. At what age was he at that point? He was under 21. He ages out at age 21. He aged out after the second hearing. Right. And he turned 21. What year? Remind us. I believe it was — it would have been in 2000, after his birthday. Correct. Yes, I'm sorry. But under the statute that was passed after this happened, we would have looked to the filing date rather than to the adjudication date, and he would have qualified under the filing date. Is that right? That is correct. And under the regulation that was in effect at that time, the filing date controls. If we were to deny the petition, where would that leave him? We still have the issue of whether he has what his citizenship is, and this creates a real dilemma for resolving this case. If he is, in fact, a U.S. citizen, case over. That can only be termed — I believe could only be determined on a transfer of the case to the district court. His remedies, if he were to be found stateless or found to be a Mexican national, ultimately after hearing of the fact in the district court, would leave him now with a current visa, because under the current state of the law, his visas are all current, no matter what his status are. So what are the procedures — and I didn't see this in the briefing, and maybe you know, maybe you don't — but what are the procedures to get from here to having him be declared stateless? What I would like — my proposed procedure would be simply if he's remanded to the district court, and you make those finding of facts, and we have a definitive statement — Those findings? Which findings of fact? Findings of fact would be whether or not he's expelled from Mexico as a United States citizen. He's deported back to the United States in 2003. So then the question becomes, you can certainly subpoena the records from or subpoena a counselor officer from Mexico to present evidence as to why and what basis they claim he's a United States citizen. Well — Well, I'm not sure I'm understanding yet. Is this in order to get a declaration of a United States citizenship into the district court, or is this to get him declared stateless? One is a United States citizen, and the second issue is he's stateless. Yeah, so I asked, what are the procedures to get him declared stateless? You'd have to have a hearing on the evidence. In the district court?  And then if they've determined that he is not, in fact, a United States citizen, then he would be left with no other status except to be stateless if Mexico does not think he's one of his citizens. So I want to ask about this Mexican proceeding. So at this point, we have a proceeding in Mexico that says he is not a Mexican citizen, correct? They say he is a United States citizen. Right. That's how they phrase it. Right. Which I guess by definition, maybe you could be a dual citizen, but in any event, he's a U.S. citizen according to Mexico. Yes. All right. And then, was there any appeal or further proceedings in the Mexican proceeding after they determined that he is a U.S. citizen? No. As far as I understand it, there was an order of expulsion. They expelled him the next day. They sent him to San Ysidro, and in San Ysidro, he was paroled and he was... To the U.S.? Right, exactly. It wasn't an illegal reentry. We might have a few more questions, so we'll do those first, but I just wanted to let you know you have about three minutes left. Not right now, no. You want to reserve the remaining time? If I could, unless there are some other questions. I've got a question or two that may be relevant to ask now so that the government has a chance to respond. Is there any possibility that he would qualify under the so-called foundling statute? That is to say, he was in the United States before he was five, and we have under certain parts of our federal law and the criminal law that found in the United States merely means being present in the United States. Is there a possibility of him qualifying under the foundling statute? That issue... I've not heard an argument from you on this point. Okay. There's a possibility, of course. But you've not made that argument at this point? No, I have not raised that in the brief. It was raised by the government brief on the issue of whether a 301G, F rather, claim would be made. And the problem with that statute is that he is aged out at that point. He had to make that before he had turned 21. And I know he is now standing in line for a visa on the assumption that he is a Mexican citizen, and he's got a certain priority date, I think it's September 97, and that line is moving very slowly. Any estimate as to when his visa would come up between here and the time it might come up? Right. Under the Childhood Protective Status Act, which was passed after he was found to be be everything's current. How long is it going to take, I think is the question. How long would it take? If the visa's available, he can apply now. Is that a different visa? Yeah. I've got a different question. He has an approved visa, but he's waiting in line to sort of... the number to come up because very few people are allowed per year. So that line is moving slowly. I'm trying to figure out, if he still waits in that line, what's the likely date upon which he will actually get that visa operative? That visa is current. No, no. I'm asking a different question. When will he be admitted under that visa? I see. He would have to have it adjudicated. He could do that by way of a motion to reopen administratively, and that would be the process for him to apply for the adjustment of status. Okay. We'll have to... I'm not sure you're... His question is the time, but anyway. All right. Thank you. All right. Good morning, Your Honors. Matthew Connelly for the Attorney General. May it please the Court. Your Honor, the petition for review should be denied because Mr. Werthmann has not either established his citizenship or raised a genuine issue of material fact regarding whether or not he is a citizen of the United States. Furthermore, Mr. Werthmann has not identified sufficient circumstances that would allow this Court to review his previously executed removal order. Well, let me ask you a question, Counsel. You know, it seems to me that even if you are correct on the points that you have made in your brief and summarized this morning, one thing we have to look at is whether there has been a gross miscarriage of justice. Would you agree with that? Right. That would be a question as to whether or not that would have to be established in order to look at the original removal order. Yeah. You know, Justice Kennedy once said, sometimes in a published opinion from the Supreme Court, that there are rights for which there are no remedy. And maybe this is one of those cases, I don't know. But the fact of the matter is, this is an incredibly sad case because this man, and I think Judge Fletcher pointed it out superbly, but for time manipulation a little bit and but for the passage of laws in one day versus another, wouldn't be in this position at all. It certainly seems like something that most people would be, if they have a conscience at least, upset by. And as I said, there may not be a remedy here for him, but there certainly should be. I understand your position, Your Honor. This case has taken an unusual course, and therefore an unusual amount of time in that process. However, there is nothing, no statute that places a timeline on the adjudication of this type of visa, nor is there a due process liberty interest in discretionary relief, which is ultimately what Mr. Werthmann was seeking, an adjustment of status. So on that point, is the Attorney General vested with discretion on the adjustment of status? If the petitioner is otherwise eligible, and that one of the eligible requirements is that there be an immediately available visa at the time of the application. And why wasn't a visa immediately available? Well, the visa was not available as an immediate relative visa because it was not approved before Mr. Werthmann turned 21. And that is solely because of a time, a temporal problem with the granting of the visa? That is certainly a factor, but there has been no discovery on what the process was, what the questions were as to why the visa, how the visa worked its way through the adjudication process. How long did that adjudication process take? The record doesn't reflect any particular time frame for that, Your Honor. I understand this case has been in mediation, is that correct? Yes. I guess I'm a little surprised that we're talking about one individual who was clearly here with his adoptive parents for all that time while he was a juvenile. It was a... And I guess you're, are you telling us that the Attorney General's unwilling to either exercise discretion or to recognize that through the series of circumstances, and maybe through no fault of anybody, but that there has ultimately been a miscarriage of justice with respect to this individual? It would... The question of whether or not there's been a gross miscarriage of justice does not relate to the actions after the order was issued in 2002. It relates to the question of how that order was issued, whether or not the order itself represents a gross miscarriage of justice. Right, but although it's not a statutory requirement afterwards, the result is the same, is it not? I mean, we're talking about one individual who really through some weird confluence of remedial statutes that recognized that through no fault of their own children were being denied adjustment of status. And then we have this delay, which there's no suggestion he caused that, correct, in the issuance of the visa? Well, perhaps not Mr. Werthmann, perhaps Mr. Werthmann's parents who waited so long to attempt to change his status. Right, but that's the reason that these laws were enacted, because not everybody sleeps with the immigration code under their pillow in terms of being a parent. So I mean, that's why we have all these series of statutes that were designed to fix this, but they don't fix Mr. Werthmann's situation. No, Your Honor, they do not. And what, in your view, what are his options now? If the court were to deny the petition, what would happen? Well, there would be, as counsel indicated, there is the option of filing a motion to reopen. It would be untimely unless the Department of Homeland Security joined in that motion. And would you join in that motion on behalf of your client, the Department of Homeland Security? That's not my decision, Your Honor. It's not really a decision of the Department of Justice, it's a decision of the Department of Homeland Security. I understand. That's the client, I recognize the situation you're in, but that's one option, and we'll come back to that. Are there other options? And if that, but that option also has other issues. Mr. Werthmann stands convicted of a crime involving moral turpitude, which renders him inadmissible. There would have to be a waiver of that inadmissibility, as well as an immediately available visa. And my understanding of the crime of moral turpitude, it was arson, but it was not arson like burning down a house to get insurance proceedings. He was essentially being a bad boy, playing with matches. It gets out of control and it burns the family home, correct? It was, I believe, the statute described it as willful and wanton conduct. It is not, it was not part of a fraud scheme, that is correct, Your Honor, but the... He wasn't trying to kill anybody by burning them down inside the house. It was, he was playing with, recklessly, probably. I'm not getting into the facts behind the conviction. No, I'm not trying to get into that, but I think the point is... There's arson and there's arson. Yes, that's right. I would agree with that statement, Your Honor. The arson code does contemplate both types of crimes. Right. Provides different punishments. If I'm looking for an evil person, I think I'm not going to find Mr. Werthmann in that category. I'm going to find a troubled boy. I understand your position. So, let's kind of keep marching through these. We've got the motion to reopen that, of course, has a series of hurdles that you have to get through. If the motion to reopen is denied and the United States, and he's not a U.S. citizen for whatever reason, but Mexico says he's not a citizen there, would he be stateless? Person is stateless if they have no citizenship anywhere, but that would mean that that particular decision of that one administrative officer was going to be upheld by Mexico. We have no idea what was behind that decision and whether or not, if it were pressed, it would hold up. But at some point, you're faced with kind of competing denials by nation states, and at least it raises the specter that he could be stateless, correct? It is possible, Your Honor, but the code, the Immigration and Nationality Act, does provide a process for removal of individuals whose country of citizenship will not take them back. Removing them to a third country. That is correct. That would be pretty amazing, wouldn't it, here? That would be the— And it's rarely done as a practical matter, not in this kind of situation, but in general, correct? My understanding is you're correct, Your Honor. Okay. So that's a possibility. We could have a motion to reopen. We could have a statelessness hearing. Are there any other options in this situation? Well, on the question of statelessness, that's something that would be determined at the administrative level, if it were remanded to the board, as opposed to sending it to the district court. The only reason to transfer to a district court would be to determine whether or not Mr. Werthmann is a United States citizen. Correct. So that's the other one, is he could prove he's a U.S. citizen or he could not. Right. Okay. But to also remove Mr. Werthmann, then there's the question of what process has to occur. And I don't—since we don't—the habeas petition doesn't encompass any process that Mr. Werthmann underwent in front of the immigration court after his return from Mexico. If this case were, for example, held in abeyance pending a motion to reopen and or a petition for statelessness or such other remedy as may be available under the immigration laws, then we would know the answer to those questions, correct? It is possible, Your Honor. There would have to be—if the court is looking—the question is, is the court looking for a report from the parties as to what the process would be if the case were remanded? No, I'm just asking you—we see quite often that cases are either held in abeyance or they're remanded to give petitioners an opportunity, for example, to file a motion to reopen, re-recognize. That would be out of time and you have yet other hurdles. So without making a judgment on what might happen, if we were to either hold the case in abeyance here or remand it, then one or more of these potential avenues could be pursued, correct? If the case—yes, something would be pursued, but whether that—if a motion to reopen is not granted, I'm not sure exactly what the process would be because there's a real question as to whether or not reinstatement would apply if Mr. Werthmann was paroled in. I don't know the exact circumstances, but it's not an illegal re-entry. Right. Well, that, of course, goes into the consequences, the collateral consequences of denial of a motion to reopen, which may then have another appeal. But without getting into that because no one could— The question of where to remove Mr. Werthmann would only come up with an order of removal. Correct. And it does not appear that Mexico would welcome him if he were to be removed to Mexico. It does not appear—I'm sorry, Your Honor. Okay. If there were an order of removal to remove him to Mexico, it does not appear that Mexico would be welcoming him. On the basis of the current record, it appears Mexico would decline. That's right. Okay. So what, he's going to maybe be stuck between the walls, do you think? What happens? Neither Mexico wants him? We don't want him? Where does he go? Well, then it's up to— Ship him off to Brazil? What do they do? The Department to determine if there is another country that will take him. There is a process— You know, that's just crazy. You can't seriously ask us to think that that's a rational proceeding. He was apparently born in Mexico. He came to this country as an infant. He really knows only this country. And you're suggesting that we send him off to some country that you can't even name at this point because we don't want him, Mexico won't take him, and say some other country. That's realistic? Are you serious? That is what the law would—that is the process that the Immigration and Nationality Act would require. I believe I've gone over my time. Thank you. But I don't want to cut off any questions. No, I still have questions. I'd like to ask you the question that I tried to ask Mr. Bennett. I gather he has an approved visa application coming from Mexico, and he's standing in line. Do you know anything about that in terms of how fast that line is moving and when he might actually—that might actually bear fruit for him? I looked at the visa bulletin for February, and I believe it said July 1997 for his first preference, and assuming he's a first preference, then it's getting close. I maybe— I'm trying to figure out how long we should hold this case in abeyance. That is to say, if that's going to happen within six months, that's one thing. If it's not going to happen for 20 years, that's quite another. I don't know that it's going to take that long. I'm really—I have not been watching that line, so I don't know how fast it's moving through the months. But it is certainly— Well, no, I appreciate that you consulted the bulletin to kind of see where things are. Yes. I will get back to the bulletin and inform the Court what the status of first preference is. I do not know offhand that he remains a first preference. I understand that is the petitioner's position. I would appreciate it. I think the panel would appreciate some further information on that point. Yes. I will take care of that when I get back to DC. Thank you. Thank you. Thank you. Thank you. Yes, Your Honors. I'd like to use my 40 seconds rather quickly here just on two little points. The period that it took to adjudicate this visa after the filing was from—the filing was September 25, 1997, and then it was finally, ultimately—that was in Los Angeles—ultimately approved in Phoenix on January 2, 2002. So it's about a four-year hiatus. And when did he age out during that four-plus years? He aged out after the first immigration hearing with the judge in 2000. He aged out at his birthday, which would be the 15th of December of 2000. So it took two more years for the visa to get adjudicated after his— I think it was roughly a little over a year, if I'm not mistaken. But anyway, a year or more. But that adjudication was sitting there for over two years while he was still age-eligible. Right. And there's been no explanation as to why that is so. It's particularly glaring because the daughter was—the sister was processed rather promptly. I'm sorry, Your Honor. It was a one-step petition was the way it was filed. Yeah. Well, let me just go through some of these options that I walked through with Mr. Connolly and one we just talked about. He's suggesting that you, of course, requested first preference, and he doesn't know how the visa line is moving now, but he'll inform us of that. My understanding under the visa bulletin, if I'm reading it correctly, both first—any possible preference he could be are all current. I may be mistaken on that, but it's very close if it's not exactly. But I believe it's actually current based on the State Department's publication. And if the case were to not be decided and held in abeyance for whatever reason, he suggests there is the possibility of motion to reopen or, of course, as you said, the statelessness proceeding or back to the district court on U.S. citizen. Would any of those be pursued? Well, if the court were to order it remanded, excuse me, transferred back to the district court, then we just have the very, as counsels pointed out, very narrow issue of citizenship as an American, not as anybody else. If that's definitively determined, then this court would have no authority to do anything other than— It would move the appeal. Right. Exactly. Right. It would move the appeal. So he's either an American or he's not, correct? Under the transfer statute. Under the transfer statute. Under the other possible remedies, he's most likely stateless. That's my opinion. Okay. So if he's determined not to be an American by the district court, then would you still have the motion to reopen option? I believe I would if there was a current visa available. Okay. So then, and you would then, depending on if that were not successful, you would have a statelessness option potentially. Right. But you'd need, of course, a hearing and determination on that. Exactly. So are you asking us to remand? I know you would ask us to actually grant the petition, but if we did not grant it outright, as you're suggesting, what are you asking us? I believe, and this is a novel issue for me— I'm sorry, Mr. Connolly. I think there would be the authority of this court to remand it to the BIA, because we're treating it as a petition for review under the Real ID Act. Remand it to the BIA for what purpose? For the purpose of, I think it would have to be in conjunction with a, well, thinking about it, and I think it would have to be in conjunction with a motion for reopen in order to adjudicate his 245—280—excuse me, his adjustment of status application. And do you see then that a potential remand to the district court with respect to citizenship versus a remand to the board, or would you see those as occurring in parallel? Procedurally, I don't know. I think you could probably do them in parallel. All right. What's Mr. Werthmann doing right now? As a practical matter, what's his status? He is currently living in Santa Barbara County in Santa Maria, which is where his adopted father lived before he passed away. He is currently indigent, and that's essentially where he is. His family ties connections that still survive are in Berkeley, California, in the San Francisco district. So he has family networks still, but as time passes, attrition sets in, mortality sets in. Just one last point, if I may, Your Honor. The misdemeanor—see, Arson was reduced to a misdemeanor after he was expelled from Mexico and taken into custody under a warrant from Santa Barbara County on a potential probation violation. That was then reduced to a misdemeanor at that point. So it would be, depending on his overall criminal history, that would be no longer a crime of moral turpitude, bar under a waiver of the petty exception. So on a motion to reopen, that's not yet another hurdle he has to jump over, in your view? I believe there's a legal argument against having to do that. Judge Ezra? You know, this has nothing to do with this case, but my concern is that bandied around here were a lot of comments made about what the parents might have done or could have done. I would like to—and this is speaking for myself only—assuage any thoughts that they might have that this was in their responsibility or fault in any way, shape, or form. It seems to me, looking at the record, that Mr. Werthmann's parents were exceptional individuals. They adopted 10 children who were in extreme circumstances with very little help, if any, at that time from the government or anyone else. And I think for them to feel any guilt over this would be, in itself, a gross misjustice. Thank you, Your Honor. Thank you. I would like to thank both counsel for your argument, and also it's quite apparent that both of you are highly skilled and fluent in the immigration law. And believe me, that is a real pleasure for us because each one of these cases stands on different footings. So thank you. Thank you both for your argument and also for the briefing in this matter. The case of Werthmann v. Whitaker is submitted. The last two cases, Marlowe v. City and County of San Francisco and Watson v. City of San Jose, are submitted on the brief and were adjourned for the morning.
judges: McKeown, W. Fletcher, Ezra